UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BLINK HEALTH LTD. AND APOLLO ACCESS LTD., <br><br>          Plaintiffs, <br><br>       v. <br><br> MEDIMPACT HEALTHCARE SYSTEMS, INC., MINCA, INC., BH HOLDINGS GROUP I, LLC, AND SCOTT PAUL, <br><br>          Defendants. | 17 Civ. _____ <br><br> **COMPLAINT** <br><br> JURY TRIAL DEMANDED |

Blink Health Ltd. and Apollo Access Ltd. (together, "Blink Health"), by their undersigned attorneys, upon personal knowledge except where otherwise stated, allege as follows:

## Summary of the Action

1.  Blink Health's mission is to provide affordable prescription drugs to the uninsured and the underinsured at all pharmacies nationwide.  In today's opaque and highly consolidated prescription drug marketplace, which is dominated by a few parties focused primarily on protecting their own market position rather than patient welfare, that is no easy task.  This lawsuit is the unfortunate but necessary product of the uphill battle Blink Health faces.

2.  Specifically, Blink Health is compelled to bring this lawsuit against MedImpact Healthcare Systems, Inc. ("MedImpact"), its pharmacy benefit manager ("PBM"), because MedImpact has, among other things, willfully and repeatedly flouted its contractual commitments to maintain networks of pharmacy chains available to fill prescriptions for Blink Health members at steady, competitive prices.  Contrary to the written obligations it undertook in no uncertain terms, MedImpact now professes that

it is actually *incapable* of doing precisely what it contracted to do.  What is worse, it is now clear that on any number of critical issues, MedImpact time and time again lied to Blink Health in a deliberate and improper attempt to keep extracting ever-more lucrative fees from Blink Health—$27 million and counting—all the while increasing Blink Health's dependence on MedImpact and thereby simultaneously decreasing Blink Health's leverage.  All of this (and other) misconduct by MedImpact has resulted in substantial damages to Blink Health.

3.      Blink Health is a healthcare company founded in 2014 by Geoffrey and Matthew Chaiken.  Through its website and free mobile app, the company enables hundreds of thousands of uninsured and underinsured patients in need of prescription medications to purchase their medications at low, negotiated prices at pharmacies located throughout the United States.  Although young, Blink Health has grown substantially since its inception.  It now has hundreds of thousands of patients nationwide and, by virtue of the company's innovative, proprietary technology, its patients now have access to more than 15,000 medications at affordable prices.

4.      In order to provide its patients with access to pharmacy locations to pick up their medications, Blink Health has contracted with what are known in the pharmaceutical industry as PBMs, companies that contract with and maintain networks (or groups) of pharmacy chains available to fill prescriptions.  In short, PBMs are middlemen.  They negotiate on behalf of their aggregated clients for lower prices with their network pharmacies and supposedly extend the savings on pharmacy services to their clients.

5.     MedImpact is one such PBM with which Blink Health has contracted via a "Service Agreement."  The Service Agreement was originally executed in March 2015, with an effective date of April 1, 2015.  Pursuant to the Service Agreement, MedImpact provides PBM services, including claims and payment processing services, to allow Blink Health's patients to pick up prescriptions ordered through Blink Health at participating pharmacies.  For the first year of the contract, MedImpact appeared to perform its obligations under the Service Agreement.

6.     In May 2016, the parties amended the Service Agreement, extending its term from five to ten years, at MedImpact's request, and removing a mandatory arbitration clause, at Blink Health's request.  In consideration for the parties' agreement to these amendments, Fred Howe, the owner of MedImpact and MINCA, Inc. ("MINCA"), a company that maintains the non-core assets of MedImpact Holdings, was provided with substantial equity in Blink Health at a 70% discount.  This equity was acquired through BH Holdings Group I, LLC, a subsidiary of MINCA.

7.     The Service Agreement was carefully drafted in order to ensure that Blink Health could accomplish its goal of providing patients with low, stable prices at any participating pharmacy.  To that end, Blink Health negotiated for a contract encompassing four principles that were crucial to the company's business model:  (1) a promise by MedImpact that it would provide a stable national network of pharmacies sufficient to serve Blink Health's patients; (2) a guarantee from MedImpact that it would provide Blink Health stable, competitive prices; (3) protection from any adverse effects stemming from MedImpact's subsequent negotiations with pharmacies or other third parties; and (4) a non-exclusive relationship that would permit Blink Health to pursue

3

direct negotiations with pharmacies or other PBM providers once it had grown sufficiently. Each of these principles was essential to Blink Health, as Blink Health repeatedly communicated to MedImpact during the parties' negotiations. In fact, Blink Health would not have entered into any agreement inconsistent with these principles, all of which were incorporated into the Service Agreement.

8.      Although the Service Agreement embodies these four essential principles—all of which impose obligations on MedImpact—MedImpact has failed to adhere to any of them and indeed now contends it cannot. Specifically, MedImpact has deceived Blink Health in numerous ways over time in an effort to keep Blink Health commercially dependent on MedImpact while at the same time, having limited Blink Health's leverage through its false assurances, taken repeated, unlawful actions to extract additional profits from Blink Health's claims. Despite MedImpact's obligation to maintain a stable national network of pharmacies, MedImpact has permitted three major national pharmacy chains—Walgreens, Publix, and CVS—to exclude Blink Health patients from their pharmacies. And, in violation of its obligation to provide Blink Health with specifically negotiated pricing and to treat Blink Health the same as similarly situated MedImpact customers, MedImpact has repeatedly attempted to unilaterally and substantially increase Blink Health's prices far beyond what is authorized by the Service Agreement.

9.      These actions have resulted in significant benefits to MedImpact in several ways. By allowing larger pharmacy chains to cut off Blink Health's access, MedImpact can force Blink Health to direct its patients to smaller pharmacy chains. MedImpact has more favorable contracts with these pharmacies, which lack the economic

leverage of the larger pharmacy chains, and is able to charge higher—and in some cases, undisclosed and improper—fees to these pharmacies.  By allowing larger pharmacy chains to cut off Blink Health's access, MedImpact also curries favor with these pharmacy chains, which are threatened by Blink Health's disruptive, patient-centric business model.

10.     As it has become clear that MedImpact cannot perform under the contract as it had promised, and its breaches became more numerous, MedImpact's executives—including Scott Paul, MedImpact's Executive Vice President, who is responsible for the overall relationship with Blink Health, and Dave Halter, MedImpact's Senior Vice President of Strategic Finance Operations—have knowingly misrepresented material facts to Blink Health in an effort to keep Blink Health from shifting business to other PBMs or terminating the Service Agreement, which would deprive MedImpact of the millions of dollars of fees it receives from Blink Health.  Both Mr. Paul and Mr. Halter report directly to Fred Howe, the founder, owner, and CEO of MedImpact.  These misrepresentations concern two specific areas:  the ability of pharmacy chains in MedImpact's network to unilaterally exit Blink Health's network and exclude Blink Health's patients from their pharmacies, and the nature of the rates MedImpact purportedly negotiated with CVS on Blink Health's behalf.

11.     After MedImpact permitted Walgreens, the first of several pharmacy chains, to unilaterally exit Blink Health's network in violation of the Service Agreement, Blink Health was entitled to terminate the Service Agreement for cause as a result of MedImpact's material breach.  While it considered its options, including exercising its termination rights, Blink Health sought assurances from MedImpact that no

other pharmacy chain could similarly target Blink Health.  Instead of telling the truth and jeopardizing the fees it was receiving from Blink Health, MedImpact lied.  Senior MedImpact executives, including Mr. Paul, told Blink Health that *no* pharmacy chain other than Walgreens had this right.  Blink Health asked MedImpact to review its contracts to confirm this, and Mr. Paul later said MedImpact had done so and provided Blink Health with such confirmation.  That representation was false, as evidenced by the fact that MedImpact later permitted additional pharmacy chains to exit Blink Health's network.  Acting in reliance on that false representation, Blink Health did not exercise its termination right after Walgreens was permitted to exit the network, and indeed conveyed to its investors, in the context of raising additional capital, that Walgreens was the only chain with unilateral withdrawal rights.  Mr. Paul privately has not denied having made such representations, although now, incredibly, MedImpact's "official" position is that it made no such statements.

        12.     MedImpact's fraud extended to another area, as well.  In December 2016, after Walgreens had notified MedImpact of its intent to exit the Blink Health network, MedImpact informed Blink Health during a December 21, 2016 call that it had negotiated a new rate agreement for CVS's pharmacies.  Mr. Paul specifically told Blink Health that these rates were permanent and not subject to change.  He also represented that these rates could be even lower if Blink Health committed to a narrower network consisting primarily of CVS's pharmacies.  Two days later, during another call, Mr. Paul characterized these rates as "a huge win" and noted that CVS would "love for [Blink Health] to be narrow"—*i.e.*, to have some kind of exclusive relationship between CVS and Blink Health.

13.     In reliance on Mr. Paul's representation, Blink Health spent millions of dollars transferring patients who had previously used Walgreens over to CVS and directing new Blink Health patients to CVS.  This was yet another statement by Mr. Paul that quickly proved false.  Several months later, on August 21, 2017, CVS informed Blink Health that it was unilaterally exiting MedImpact's network for Blink Health patients.

14.     When CVS was permitted to exit, MedImpact was forced to reveal to Blink Health that it had made false statements to Blink Health about its relationships with pharmacy chains and its ability to manage its network, all in order to induce Blink Health to enter into the Service Agreement in the first place.  The Service Agreement requires MedImpact to maintain a stable pharmacy network, but MedImpact apparently does not have, and has never had, the ability to fulfill that requirement.  Thus, when Blink Health pressed Mr. Paul to explain how CVS could withdraw from Blink Health's network despite the terms of the Service Agreement and the 2016 contract review, MedImpact responded with an astonishing—and utterly false—denial that it had ever told Blink Health that pharmacies could not exit its network.  Yet, on two separate calls with Blink Health executives, both before and after MedImpact's written, self-serving denial, Mr. Paul conceded that MedImpact had in fact told Blink Health that Walgreens was the only pharmacy that could exit, and expressly acknowledged the detrimental impact of his prior misstatements.

15.     Moreover, MedImpact now asserts that *any* pharmacy can exit Blink Health's network with 30 days' notice.  MedImpact cannot have it both ways: either it was lying in November 2016 when it told Blink Health that no other pharmacy

chain could exit, or it is lying now as it permits another pharmacy chain to exit Blink Health's network. This is just the most egregious example of MedImpact telling Blink Health whatever it believes to be in its own best interests at any given time, even if MedImpact knows in the moment that what it is saying is objectively and demonstrably false. Had Blink Health known the truth—that MedImpact contracted to provide a network it could not provide, selling what was in effect "vaporware"—Blink Health would not have entered into the Service Agreement in the first place.

   16. Beyond its initial misrepresentations about its ability to maintain a network, intended to fraudulently induce Blink Health into the Service Agreement, and its willful and material contractual breaches, MedImpact has also breached the implied covenant of good faith and fair dealing inherent in the Service Agreement by taking actions to enable, and in some cases, encourage the pharmacies in its network to unilaterally exit Blink Health's network. It has done so for a variety of reasons: initially, because MedImpact decided it would prefer that Blink Health direct patients to smaller pharmacy chains where MedImpact could charge higher fees, and later, because MedImpact recognized the disruptive implications of Blink Health's patient-centric business model and decided to attack Blink Health's very existence.

   17. MedImpact's misconduct directed at Blink Health is not limited to fraudulent conduct and contractual breaches. MedImpact has also embarked on a campaign to tortiously interfere with Blink Health's efforts to reduce its reliance on MedImpact by contracting directly with pharmacies. While MedImpact initially encouraged Blink Health to negotiate directly with certain pharmacies, once it understood the implications of Blink Health's business model, MedImpact began doing everything in

its power to prevent Blink Health from actually consummating direct relationships with pharmacy chains, including by falsely representing to pharmacies that MedImpact and Blink Health have an "exclusive" relationship. These knowingly false representations are the product of a misguided, and indeed unlawful, attempt by MedImpact to harm Blink Health and exploit prescription medication consumers by driving up drug prices.

18. In short, it is clear that MedImpact has concluded that Blink Health's disruptive business model is an existential threat to MedImpact's position as a rent-seeking middleman. In response, MedImpact has engaged in a nonstop campaign to keep Blink Health dependent on MedImpact. MedImpact will apparently stop at nothing, including outright fraud, to ensure that Blink Health is either subjugated to MedImpact or cannot survive as a viable business.

19. MedImpact's fraudulent conduct, contractual breaches, and tortious interference with Blink Health's business relationships have harmed, and will continue to substantially harm, Blink Health's business and the patients who depend on the affordable prices that Blink Health provides. While Blink Health has made all reasonable efforts to work with MedImpact and persuade it to abide by the terms of the Service Agreement and to cease from engaging in other wrongful conduct, MedImpact has, for reasons only it can explain, refused these good faith entreaties.

## The Parties

20. Plaintiff Blink Health Ltd. is a Bermuda corporation with its principal place of business in New York, New York. Blink Health Ltd. is the successor in interest to Vital Matters, LLC, a party to the Service Agreement.

21. Plaintiff Apollo Access Ltd. is a Bermuda corporation with its principal place of business in Bermuda. Apollo Access Ltd. is the successor in interest to

Blink Health Core Ltd., the entity to which Vital Matters, LLC assigned its rights under the Service Agreement, and a party to Amendment #1 to the Service Agreement. Apollo Access Ltd. is a wholly-owned subsidiary of Blink Health Ltd.

22.     Defendant MedImpact Healthcare Systems, Inc. is a California corporation with its principal place of business in San Diego, California.

23.     Defendant MINCA, Inc. is a Delaware corporation with its principal place of business in San Diego, California. According to MedImpact's website, MINCA "maintains the non-core operations of MedImpact Holdings, Inc." and has "subsidiaries operating in real estate, aviation, and equity holdings industries."

24.     Defendant BH Holdings Group I, LLC is a Delaware corporation with its principal place of business in San Diego, California. BH Holdings Group I, LLC is a wholly-owned subsidiary of MINCA, an affiliate of MedImpact, and the entity through which Mr. Howe and MedImpact invested in Blink Health.

25.     Defendant Scott Paul is a citizen of the state of Georgia. On information and belief, Mr. Paul is, and, during the relevant time period, was an employee of both MedImpact Healthcare Systems, Inc. and MINCA, Inc.

**Jurisdiction and Venue**

26.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest.

27.     The Court has personal jurisdiction over MedImpact because, among other things, pursuant to Amendment #1 to the Service Agreement, MedImpact agreed to jurisdiction in this Court with respect to "any legal action, lawsuit, or other

10

legal or quasi legal proceeding . . . arising directly or indirectly out of, in connection with or relating to" the Service Agreement.

28.     The Court has personal jurisdiction over MINCA because Scott Paul is an employee of MINCA who has transacted business within the state on behalf of MINCA.

29.     The Court has personal jurisdiction over BH Holdings Group I, LLC because, among other things, pursuant to the Stock Purchase Agreement, BH Holdings Group I, LLC agreed to the jurisdiction of this Court with respect to "all matters arising directly or indirectly from" the Stock Purchase Agreement.

30.     The Court has personal jurisdiction over Mr. Paul because, among other things, the object of his fraud was to cause Blink Health, a New York domiciliary, harm.  Mr. Scott has attended at least six meetings with Blink Health in New York City and has thereby transacted business within the state with Blink Health Ltd., a New York-based company.

31.     Venue is proper in this Court both because MedImpact agreed to venue in this Court with respect to all disputes arising under the Service Agreement and, pursuant to 28 U.S.C. § 1391, because there is no state in which all defendants reside, Blink Health's headquarters are in this judicial district, and a substantial part of the events giving rise to the claims occurred in this district.

**Factual Allegations**

**A.     Geoffrey and Matthew Chaiken Found Blink Health, an Innovative Business Dedicated to Providing Low-Cost Prescription Drugs**

32.     Blink Health is a consumer healthcare company that serves uninsured and underinsured patients in need of prescription medications.  The company is

led by Geoffrey Chaiken, the CEO, Matthew Chaiken, the COO, and William Doyle, Executive Chairman.  The company's mission is to ensure that all Americans have access to affordable prescription medications at all pharmacies.

33.     Blink Health's free membership enables patients, regardless of insurance status, to purchase thousands of prescription drugs at substantially lower prices than they would otherwise have to pay.  Blink Health's patients purchase prescription medications using Blink Health's free website and mobile applications and—but for the unlawful conduct that is the subject of this lawsuit—should be able to pick up these medications at over 67,000 pharmacies throughout the United States pursuant to Blink Health's Service Agreement with MedImpact.

34.     Since it officially launched in February 2016, Blink Health has grown rapidly and now provides hundreds of thousands of patients nationwide with access to lifesaving and/or life-changing medications that they previously could not afford.  Many of Blink Health's patients lack prescription drug insurance coverage or cannot afford their medications with the coverage they do have.  Blink Health's internal data show that approximately 60% of Blink Health's patients previously reported skipping doses or entire prescriptions because of costs.  Now, instead of being forced to forgo critical medications because of their financial status or lack of insurance coverage, Blink Health's patients can access their prescriptions at substantially lower prices.

35.     Blink Health's patients have reported that Blink Health is essential to providing them access to necessary medications at a time when drug prices are rapidly increasing.  As CVS's Executive Vice President, Pharmacy Services and Supply Chain, Kevin Hourican explained to Blink Health in a November 2016 email:  "[i]t is very clear

to me, and to our patients, that [Blink Health is] solving an un-met consumer need with your service . . . ."

**B.**   **Blink Health's Business Relies in Substantial Part on "Pharmacy Benefit Managers," such as Defendant MedImpact**

36.    MedImpact is what is known in the healthcare industry as a pharmacy benefit manager ("PBM").  PBMs act as intermediaries between patients and pharmacies and thus are essential to the operation of a company like Blink Health.

37.    PBMs maintain networks (or groups) of pharmacies through which patients' prescriptions may be filled.  PBMs negotiate lower prices with their network pharmacies and extend the savings on pharmacy services to their clients.  The U.S. healthcare system relies on the negotiating power of PBMs to provide Americans access to fair drug prices.

38.    Defendant MedImpact is one such PBM.  MedImpact was founded in 1989 by its current Chairman and CEO, Fred Howe.  It is the nation's largest privately held PBM and claims to cover 47 million patients.  MedImpact also claims to manage a network of over 67,000 pharmacies.  It generates substantial income for itself by inserting itself as a middleman between pharmacies and patients, as well as by indirectly managing rebates for patented or brand name medications.  On information and belief, approximately 40% of MedImpact's income comes from its cash discount card business—a form of pharmacy benefit program that provides its patients with substantially fewer benefits than a funded program like Blink Health and lacks the transparency of Blink Health's business.  MedImpact is able to charge patients much higher fees for cash discount card prescriptions than for traditional commercial claims.

13

39.     Defendant Scott Paul and non-party Dave Halter are senior executives at MedImpact.  Mr. Paul and Mr. Halter were both closely involved in and have personal knowledge of the events described in this complaint.

**C.     MedImpact Makes False Representations to Blink Health During the Parties' Negotiations Concerning Their "Service Agreement"**

40.     In February 2015, Blink Health (then known as Vital Matters, LLC), and MedImpact began negotiating an agreement—referred to as the "Service Agreement"—under which MedImpact would provide PBM services to Blink Health.

41.     At the time of these negotiations, Blink Health was still in its incipient stages and had not yet launched its core product.  The selection of a PBM provider was one of the most important decisions Blink Health had to make to establish and, it was hoped, expand its business.

42.     The heart of Blink Health's business is to provide its patients with reliable access to low-priced prescription drugs at a stable national network of pharmacies.  As such, Blink Health entered the negotiating process with four specific goals.  In particular, Blink Health needed, and specifically sought in the parties' negotiations:  (1) a stable national network of pharmacies large enough to service Blink Health's patients; (2) stable pricing so that Blink Health could provide its patients with one low price across pharmacies; (3) guarantees that its pricing and network would be protected from the actions of other MedImpact clients, including other pharmacy chains; and (4) flexibility to work with other partners as its business grew.  In short, Blink Health considered its negotiations with MedImpact to be a pivotal decision for the fledgling company.

43.     All of this was made known to, and undoubtedly understood by, MedImpact during the parties' negotiations.  Blink Health's cofounder and CEO, Geoffrey Chaiken, directly oversaw and participated in the negotiations for Blink Health. He repeatedly conveyed the company's goals to MedImpact, which was represented in the negotiations by Iliana Vasquez-Enochs, Contract Manager for MedImpact, and Rod Wade, MedImpact's Head of Contracting.  Other current and former MedImpact employees who were involved in and have personal knowledge of the Service Agreement negotiations include Bill Barre, Dave Halter, and Lisa Brenden.

(a)     **Blink Health Negotiated for a Stable Network of Pharmacies**

44.     As noted above, Blink Health needed to have a stable network of pharmacies in place before launching its business and raising additional outside capital. In order to ensure access to such a network, Blink Health specifically negotiated for appropriate contractual protections.

45.     In the initial February 18, 2015 draft of the Service Agreement provided by MedImpact, the description of the network MedImpact would provide read as follows:

> Client delegates its pharmacy network administration to MedImpact. Such delegation shall include authorizing MedImpact to establish participation agreements with Participating Pharmacies. Client acknowledges and agrees that any additions or deletions to Client's pharmacy network shall be in compliance with all applicable Laws and subject to MedImpact's approval, however, Client retains final approval of the pharmacy network. MedImpact will maintain a Participating Pharmacy network reasonably necessary to provide services under Client's Benefit Plan.

46.     While the initial draft thus required MedImpact to "maintain a Participating Pharmacy network reasonably necessary to provide services," it did not provide for the network stability that Blink Health needed.  Accordingly, at Blink

Health's request, the March 5, 2015 draft of the Service Agreement included an

important new protection for Blink Health, in boldface type below:

> Pharmacy Network Administration. Client delegates its pharmacy network administration to MedImpact. Such delegation shall include authorizing MedImpact to establish participation agreements with Participating Pharmacies. Client acknowledges and agrees that any additions or deletions to Client's pharmacy network shall be in compliance with all applicable Laws and subject to MedImpact's approval, however, Client retains final approval of the pharmacy network. MedImpact will maintain a Participating Pharmacy network reasonably necessary to provide services under Client's Benefit Plan. **Any changes in one (1) year in MedImpact's network of Participating Pharmacies greater than 5% shall be considered a material breach of this Agreement**."

47.     This added language, incorporated into the final Service

Agreement at Section 2A, provides that if MedImpact's network decreased by more than

5% in one year, for any reason, MedImpact would *per se* be in material breach of the

Service Agreement.

48.     By making its expectations regarding network stability clear and

by negotiating for corresponding contractual protections, Blink Health was under the

reasonable impression that it had in fact secured a stable network and that MedImpact

had both the authority and the ability to actually deliver that network.

49.     As Blink Health would later learn, however, the legitimate

expectations it formed during the parties' negotiations were based on outright falsehoods

by MedImpact.  MedImpact basically sold Blink Health "vaporware."  In direct

contradiction to what it told Blink Health during the parties' negotiations and promised to

do in the Service Agreement, MedImpact now claims that it has *no* ability to maintain the

network of pharmacies it had agreed to provide.  In fact, over the life of the Service

Agreement, MedImpact permitted no fewer than three participating pharmacy chains to

exit Blink Health's network; two of those pharmacy chains are each large enough to

independently cause a 5% decrease in MedImpact's network and trigger "material breaches" of the Service Agreement under Section 2A.

50.     Had Blink Health known that MedImpact was powerless to maintain or control its pharmacy network, Blink Health would not have entered into the Service Agreement in the first place.

### (b)     Blink Health Negotiated for Pricing Protections

51.     The parties also engaged in extensive negotiations over pricing. During the negotiations, MedImpact represented to Blink Health that MedImpact clients with at least 100,000 members are placed on what MedImpact refers to internally as a "MAC3" price schedule.  "MAC" is an acronym that stands for "maximum allowable cost," a common metric in the pharmacy industry.  It provides the maximum amount that a PBM will pay a pharmacy for specific generic prescription drugs.  PBMs like MedImpact set their own MAC schedules because there is no industry standard for MAC pricing.

52.     Because Blink Health anticipated having enough patients to qualify for MAC3 pricing, MedImpact initially agreed during the parties' contract negotiations to provide Blink Health with pricing on the MAC3 schedule.  Despite that apparent agreement, however, MedImpact's initial February 18, 2015 draft of the Service Agreement did not include any provisions guaranteeing Blink Health's access to MAC3 pricing.  Instead, the draft provided by MedImpact defined MAC as follows in what was to become Section 1.16 of the Service Agreement:

> the then current maximum allowable cost of certain prescription products, selected in accordance with criteria established by MedImpact, that are subject to MedImpact's MAC pricing formulas. Multi-source drugs are eligible for the MAC list if they are: (i) A-rated generics; (ii) thirty (30) days after they are readily available through more than two (2) generic

vendors; and (iii) the products are not exclusive.  Such criteria and pricing formulas are subject to change from time to time at MedImpact's sole discretion.  Client agrees to accept any of MedImpact's MAC lists as amended from time to time in MedImpact's sole discretion.

53.     Given the importance to Blink Health of MAC3 pricing, Blink Health rejected this proposed language, and MedImpact agreed to change it.  Thus, Section 1.16 of the draft Service Agreement was revised a few weeks later, on March 5, 2015, to include the protections that MedImpact had agreed to provide and that would ensure that Blink Health received the same MAC price schedule as other similarly sized MedImpact clients.  This is how Section 1.16 appeared in that draft; the revisions are reflected in boldface type:

> the then current maximum allowable cost of certain prescription products, selected in accordance with criteria established by MedImpact, that are subject to MedImpact's MAC pricing formulas. Multi-source drugs are eligible for the MAC list if they are: (i) A-rated generics; (ii) thirty (30) days after they are readily available through more than two (2) generic vendors; and (iii) the products are not exclusive. Such criteria and pricing formulas are subject to change from time to time at MedImpact's sole discretion. **Changes made to Client's MAC list shall be similar to changes made to MAC lists of like funded Clients.** Client agrees to accept any of MedImpact's MAC lists as amended from time to time in MedImpact's sole discretion.

54.     Although this version of Section 1.16 was somewhat more consistent with what MedImpact had initially agreed to orally and far superior to what MedImpact had proposed in its initial draft, it did not go far enough because it would only protect Blink Health's pricing while it remained a small startup and would not protect Blink Health's pricing as its business continued to grow.  Thus, the parties engaged in further negotiations, resulting in the following version of Section 1.16 being included in the executed version of the Service Agreement (changes again in boldface type):

MAC. The term "MAC" shall mean the then current maximum allowable cost of certain prescription products, selected in accordance with criteria established by MedImpact, that are subject to MedImpact's MAC pricing formulas. Multi-source drugs are eligible for the MAC list if they are: (i) A-rated generics; (ii) thirty (30) days after they are readily available through more than two (2) generic vendors; and (iii) the products are not exclusive. Such criteria and pricing formulas are subject to change from time to time at MedImpact's sole discretion. **Changes made to Client's MAC list shall be similar to changes made to MAC lists of funded Clients with similar number of Eligible Members.** Client agrees to accept any of MedImpact's MAC lists as amended from time to time in MedImpact's sole discretion.

55.     This final version of Section 1.16 memorialized what Blink Health had negotiated for all along.  In a nutshell, it protected Blink Health against efforts by MedImpact to later unilaterally increase Blink Health's prices if—as proved to be the case—Blink Health's business grew, and served to ensure that Blink Health would receive prices comparable to similarly sized competitors.

56.     Blink Health would not have contracted with MedImpact had it known that MedImpact would not or could not provide the promised stable pricing consistent with similarly situated MedImpact clients.

      **(c)**     **Blink Health Negotiated for Protection Against Adverse Effects from MedImpact's Contracts with Third Parties**

57.     The original proposed MedImpact Services Agreement of February 2015 included a provision stating:

11.22   <u>Other Contractual Obligations</u>.  Notwithstanding any other provision of this Agreement, Client acknowledges and agrees that certain MedImpact services or performance standards may be affected or impacted by contractual obligations as between MedImpact and a third party and as such, with the exception of Participating Pharmacies rates, the applicable service or performance standard shall be deemed modified to the extent necessary to conform to such other contractual obligation.

58.     This initial provision, which Blink Impact understood to allow MedImpact to unilaterally change the terms of the Service Agreement or its performance

19

under the Service Agreement based on MedImpact's subsequent contracts with third parties, was totally incompatible with Blink Health's business model and therefore unacceptable to Blink Health.  Blink Health accordingly removed it from the draft it sent to MedImpact for review on February 25, 2015.  Blink Health's further revisions on February 27, 2015 also struck this section.  MedImpact, however, reinserted the provision in its March 2, 2015 draft.  On March 4, 2015, following further discussion, MedImpact's draft still contained a provision—now Section 11.21—providing for substantially similar protection for MedImpact, adding only a notice requirement:

> 11.21   Other Contractual Obligations.   Notwithstanding any other provision of this Agreement, Client acknowledges and agrees that certain MedImpact services may be affected or impacted by contractual obligations as between MedImpact and a third party and as such, with the exception of Participating Pharmacies rates, in the event of a change in such contractual obligations, MedImpact shall notify Client and the parties shall amend this Agreement to the extent necessary to conform to such other contractual obligation.

59.     This section again appeared to authorize MedImpact to modify the Service Agreement with Blink Health if a subsequent contract with a third party—*e.g.*, network pharmacies—changed MedImpact's contractual obligations to that third party. Blink Health could not and would not agree to a Service Agreement that would allow MedImpact to unilaterally change its terms based on MedImpact's negotiations with third parties, negotiations in which Blink Health played no role and as to which it had no visibility.

60.     On March 5, 2015, Geoffrey Chaiken asked Ms. Vasquez-Enochs at MedImpact to provide a justification for the MedImpact changes to Section 11.21: "We need a better understanding of what you are trying to protect against.  As written if you were acquired or partnered with a competitor to [Blink Health] it seems that this

would allow you to change our agreement so that it was no longer economic or feasible

for us to work together."  Several hours later, Ms. Vasquez-Enochs agreed to strike the

provision, which was removed from subsequent drafts and the operative Service

Agreement without further explanation.

61.     By successfully negotiating for the removal of a provision that

would have allowed MedImpact to rewrite the Service Agreement based on changes in its

contracts with third parties, including the pharmacies in MedImpact's network, Blink

Health reasonably believed that it had demonstrated that such latitude was not acceptable.

62.     The final Service Agreement provides that Blink Health is

contracting with MedImpact and that MedImpact's performance under the Service

Agreement will not be subject to the actions of third parties, including other MedImpact

clients.  Blink Health would not have entered into the Service Agreement had it known

that MedImpact would or could unilaterally alter the Service Agreement based on

changes in its contracts with third parties.

63.     Unfortunately, over the life of the Service Agreement, MedImpact

has continued to perform—or, more accurately, not perform—under the Service

Agreement as if the rejected Section 11.21 had been included.  Time and time again,

MedImpact has sought to excuse its breaches of the Service Agreement by citing alleged

changes in its agreements with the pharmacy chains in its network while refusing to

provide Blink Health with copies of those agreements or any evidence to back up these

claims.  That is not the agreement the Blink Health and MedImpact struck.  In

successfully rejecting Section 11.21, Blink Health contracted for protection from adverse

consequences stemming from MedImpact's relationships with third parties.

### (d)     Blink Health Negotiated for a Narrow, Limited Exclusivity Provision

64.     The final key issue during negotiation of the Service Agreement was a narrow, limited "exclusivity" provision.  In particular, MedImpact was interested in securing the exclusive right to bargain with pharmacies on behalf of Blink Health.  Had MedImpact gotten what it wanted, it could have prevented Blink Health from contracting with other PBMs or negotiating directly with pharmacies, leaving Blink Health wholly dependent on MedImpact.

65.     Blink Health understood that its PBM partner would have a large degree of control over the success of its business, particularly during Blink Health's early growth.  As a result, even though Blink Health accepted that MedImpact was negotiating in good faith, Blink Health was unwilling to bind itself to any single PBM in case—as happened here—issues later arose regarding that PBM's performance.  Thus, Blink Health was only willing to agree to a limited exclusivity arrangement.

66.     In the initial draft of the Service Agreement provided by MedImpact, Article 9, the exclusivity provision, read as follows:

> Exclusivity. Client agrees that MedImpact shall be the sole and exclusive agent for Client for each of the services described in Exhibit A during the Term of this Agreement.

67.     This provision was unacceptable to Blink Health.  Accordingly, the March 5, 2015 draft of the Service Agreement included, at Blink Health's request, a far narrower exclusivity provision:

> Exclusivity.  Client agrees that MedImpact shall be the sole and exclusive agent for Client for each of the services described in Exhibit A for the first one hundred thousand (100,000) Eligible Members during the Term of this Agreement.  So long as MedImpact is the exclusive agent for the Client of the services described in Exhibit A, MedImpact will not provide these services to any other direct competitor of the Client.

22

68.     This version of Article 9, incorporated without change into the final Service Agreement, limited MedImpact's exclusivity rights to Blink Health's first 100,000 patients while Blink Health assessed the viability of its business model.  The 100,000 patient cap was chosen because it was consistent with the MAC pricing MedImpact provided to other, similarly situated clients.  MedImpact told Blink Health that once it grew beyond 100,000 patients, Blink Health could work with other PBMs, build its own pharmacy network, and would likely be entitled to better pricing from MedImpact.  MedImpact's exclusivity rights under Article 9 expired on June 15, 2016, when Blink Health exceeded the 100,000 patient threshold.

69.     Again, Blink Health would not have entered into the Service Agreement if a broader exclusivity relationship had applied, as MedImpact initially sought and as MedImpact later falsely insisted it had actually secured.

**D.     Blink Health and MedImpact Enter into the Service Agreement and a Subsequent Amendment**

70.     The truth concerning MedImpact's false statements during the parties' negotiations was still unknown to, and not reasonably discoverable by, Blink Health during the negotiations.  Accordingly, and based on MedImpact's false statements, Blink Health agreed to enter into the Service Agreement with MedImpact on March 6, 2015, with an effective date of April 1, 2015.

71.     Although the initial Service Agreement reflected a degree of risk for both parties because Blink Health's business model was unproven, following Blink Health's successful launch and rapid growth, MedImpact sought to invest in Blink Health through BH Holdings Group I, LLC, a subsidiary of MINCA, at a substantial discount in consideration for amending the Services Agreement.  By this point, MedImpact had

unique access to extensive information about Blink Health, including actual claims data showing the aggregate mix of prescriptions filled by Blink Health patients.  This mix, as MedImpact was well aware, is different from the mix of drugs generated by cash discount cards.

72.    The Service Agreement was originally set to expire in 2020.  On May 5, 2016, however, the parties entered into an amendment to the Service Agreement, extending its term through May 5, 2026, with optional one-year renewal terms.  In connection with the amendment to extend the term of the Service Agreement, MINCA, Inc., through BH Holdings Group I, LLC, was allowed to invest $13 million in Blink Health in May 2016 at a significant discount to commitments made by other Blink Health investors.  The terms of this investment were memorialized in a Stock Purchase Agreement.

73.    At the same time that Blink Health has been making significant investments in its growing business, MedImpact has received and continues to receive significant financial benefits from Blink Health under the Service Agreement.  To date, Blink Health has paid MedImpact more than $27 million in fees due under the Service Agreement.

74.    MedImpact has profited from the Service Agreement in other ways as well.  Among other things, Blink Health has learned that MedImpact charges pharmacies additional fees and receives undisclosed rebates from drug manufacturers on Blink Health claims, all of which MedImpact wrongfully retains.  MedImpact has refused repeated requests to share information about these extra-contractual charges with Blink Health.  Indeed, Blink Health has learned that MedImpact has gone so far as to

knowingly submit rebates to pharmaceutical manufacturers for which Blink Health claims do not qualify because Blink Health is what is known as an "open formulary" (*i.e.*, it does not limit access to a particular list of medications).  On information and belief, after submitting these invalid rebate claims to manufacturers, MedImpact then *retains the rebates*.  Blink Health has repeatedly requested MedImpact's rebate schedule, which MedImpact has refused to disclose.

75.     To offer one particularly egregious example, during the EpiPen® and insulin crisis in 2016, Blink Health developed a system to ensure that manufacturer funds were provided directly to patients before the point of sale through an innovative and patent pending funding mechanism.  Blink Health later learned that MedImpact opposed this initiative and pressured Blink Health to discontinue it because the initiative could have revealed MedImpact's fraudulent rebate scheme.  Mr. Paul has admitted to Blink Health that MedImpact submits similar inappropriate rebate claims for other clients and does not share the savings with its patients.

### E.     MedImpact Repeatedly Breaches the Service Agreement

76.     Blink Health has consistently fulfilled all of its contractual obligations under the Service Agreement.[1]  In contrast, as detailed below, MedImpact has willfully committed numerous flagrant breaches of the Service Agreement.

---

[1]   Plaintiffs do not believe that the complaint, or any information set forth in the complaint, satisfies the standards for sealing articulated in *Lugosch* v. *Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006). Nor do Plaintiffs believe that the filing of the complaint could reasonably be interpreted to violate any confidentiality provisions in the parties' agreements.  Nevertheless, in an abundance of caution, on November 14, 2017, Plaintiffs made an application to the Part 1 Judge on duty that day seeking permission to file the complaint and certain accompanying documents under seal.  The Part I Judge on duty denied the sealing application.

(a)     **MedImpact Breaches the Service Agreement by Excluding Walgreens from Blink Health's Network**

77.     When Blink Health publicly launched in February 2016, Walgreens was a large, important member of the network of pharmacies MedImpact had contracted to maintain for Blink Health.  Walgreens' active participation in Blink Health's network led Blink Health to believe that it was engaged in a constructive partnership.  As such, Blink Health provided Walgreens with a range of proprietary information about the company to assist Walgreens' pharmacists.  Unfortunately, this seemingly constructive relationship did not last long.  Specifically, with neither any warning to Blink Health nor any factual or legal basis, MedImpact informed Blink Health in October 2016 that it was suddenly permitting Walgreens to exit the network MedImpact maintained for Blink Health.  In other words, although Walgreens remained in MedImpact's network of pharmacies, Walgreens would no longer accept any claims from Blink Health patients.  This exclusion affected none of MedImpact's other clients.  Instead, it targeted *only* Blink Health patients.

78.     Blink Health first learned that MedImpact was going to permit Walgreens to exit its network from Fred Howe, MedImpact's owner and CEO.  At the time, Mr. Howe was still a trusted partner of Blink Health, having made a considerable investment in Blink Health when the amendment to the Service Agreement was signed.  On October 4, 2016, Geoffrey Chaiken and William Doyle, Blink Health's Executive Chairman, met with Mr. Howe to discuss Blink Health's strategic direction.  At the end of that meeting, after listening to Blink Health's expansion plans, Mr. Howe revealed that five days earlier, MedImpact had received a termination notice from Walgreens.  Mr.

Chaiken and Mr. Doyle were shocked that Mr. Howe had waited to inform them of this material breach of the Service Agreement by MedImpact.

79.     Despite Blink Health's protests that it had contracted for a full network with guaranteed pricing, Mr. Howe said there was nothing that either he or MedImpact could or would do.  He then suggested that Blink Health pivot to the cash card business.  The cash card business, however, is *not* a business that helps patients in the same way as Blink Health's core business—but it certainly would earn MedImpact significantly more money, albeit at a great cost to Blink Health's patients.

80.     Although Walgreens extended the effective date of its termination notice several times while the parties worked to find a solution, those discussions did not result in a resolution, and effective March 1, 2017, Blink Health patients were cut off from Walgreens pharmacies—pharmacies that many of those patients had been patronizing for several months as Blink Health patients.  Blink Health later learned that Walgreens had agreed to an additional extension of the termination beyond March 1, 2017, a fact that MedImpact, through Mr. Paul, had concealed from Blink Health.  Mr. Paul's deception was true to form—MedImpact would benefit if Walgreens exited Blink Health's network because MedImpact was not earning as much money from prescriptions filled at Walgreens as from prescriptions filled at other pharmacies.  To this date, patients cannot fill their prescriptions ordered through Blink Health at any Walgreens pharmacies.

81.     The unexpected and precipitous elimination of Walgreens pharmacies from the network that Blink Health patients had up until that moment been able to access substantially reduced the size of the network of pharmacies at which Blink Health's patients could fill their prescriptions.  In fact, MedImpact's decision reduced the

network by more than the 5% trigger in the Service Agreement, a *per se* material breach of the agreement by MedImpact. At the time, Walgreens pharmacies represented, on information and belief, more than 10% of the participating pharmacies in MedImpact's network.

82.    Confronted with MedImpact's failure to abide by its clear contractual obligations, Blink Health attempted on numerous occasions to address the situation by engaging directly with MedImpact. Those good faith efforts proved to be for naught. Despite the clear requirements of the Service Agreement, MedImpact executives represented to Blink Health that there was nothing they could do to stop what they characterized not as MedImpact's decision to allow Walgreens to exit the network for Blink Health patients, but instead as *Walgreens*' decision to exit the network unilaterally. In other words, MedImpact tried to justify its breach of the Service Agreement by blaming Walgreens, a third party with whom MedImpact (but not Blink Health) has a contract.

83.    MedImpact's clever spin was nothing more than an effort to distract from its own contractual failings. Worse still, MedImpact for the first time disclosed that its agreement with Walgreens included the following provision which authorized Walgreens to exclude individual MedImpact clients from Walgreens' pharmacies:

> 13.1.4 Either party may terminate Member Pharmacy's participation in any individual Network, Plan, Payor, or Addendum by giving at least thirty (30) days' prior written notice to the other party. . . .

84.    At no point during the Service Agreement negotiations between Blink Health and MedImpact had anyone from MedImpact disclosed that provision in sum or substance to anyone at Blink Health. To the contrary, because MedImpact agreed

in the Service Agreement to maintain a network for Blink Health, and made promises that it would be able to do so, Blink Health reasonably believed that MedImpact in fact had the ability to maintain such a network—the very core of its obligation under the parties' contract.

85.     Blink Health ultimately decided to accept Walgreens' withdrawal from its network based in part on MedImpact's representation that CVS's rates were permanent and not subject to change.  As more fully discussed below, that representation was false.

> **(b)     MedImpact Makes False Representations to Blink Health to Induce Blink Health to Forbear from Terminating the Service Agreement in Light of MedImpact's Contractual Breaches**

86.     Given MedImpact's contractual breach relating to the exit of pharmacies from its network, Blink Health had an unequivocal right to terminate the Service Agreement for cause under Section 10.2.  Nonetheless, Blink Health did not immediately seek to exercise that right.

87.     After learning from MedImpact that Walgreens had a purportedly "unique" termination clause in its contract with MedImpact, Blink Health understandably had serious reservations about the continued viability of the Service Agreement, not to mention MedImpact's *bona fides*.  When Blink Health raised these concerns, however, MedImpact executives sought to assure Blink Health that Walgreens was the *only* pharmacy that had the right to unilaterally exit Blink Health's network.

88.     Specifically, on October 29, 2016, following the Walgreens termination notice, the parties convened a conference call in which the following high-level MedImpact executives participated:  Mr. Paul, the MedImpact executive responsible

for MedImpact's relationship with Blink Health; Bill Barre, MedImpact's Vice President

of Business Development; Aaron Roberts, CEO of MINCA, Inc.; and Steve Howe,

President of MINCA, Inc., and Fred Howe's son.  During the call, Geoffrey Chaiken

asked the MedImpact executives if any other pharmacy chains in MedImpact's network

could similarly exit a specific client's network.  Mr. Barre responded that he thought it

was "something relatively one-off that Walgreens had."

89.     Given the shocking turn of events relating to Walgreens, however,

Blink Health wanted to be absolutely certain that MedImpact's representation that other

pharmacies could not exit specific client networks was accurate.  Accordingly, Blink

Health indicated that Mr. Barre's view was not a sufficient assurance, and specifically

requested that MedImpact re-review all of its contracts with other pharmacy chains and

definitively confirm to Blink Health that no other pharmacy chain was entitled to

unilaterally exit a specific client network.  Mr. Paul agreed to do so.

90.     During a subsequent call with Blink Health on November 27,

2016, Mr. Paul stated in no uncertain terms that based on MedImpact's review of its

network contracts, "no other chain" had the right to do what Walgreens had done.

91.     In direct reliance on the express representations that MedImpact

made to Blink Health on at least the October 29 and November 27 calls, Blink Health

forbore from exercising its termination rights under Section 10.2 of the Service

Agreement.  Also in direct reliance on these express representations, Blink Health

informed its investors—in the context of seeking additional capital from them for Blink

Health's continued growth—that Walgreens' purported termination right was unique.

92.     Later events, however, strongly suggest that MedImpact, contrary to what it told Blink Health, had not actually reviewed its contracts or, at a minimum, that its claim that no other chain could follow Walgreens's example was false.  In particular, Following Walgreens' exit from the Blink Health network, two other pharmacy chains would unilaterally exit Blink Health's network.

93.     Indeed, during an April 14, 2017 call, Mr. Halter told Blink Health, for the first time, that every pharmacy in MedImpact's network had the right to exit an individual payor's network, including Blink Health.  MedImpact's statements about its contracts with the pharmacies in its network are utterly inconsistent and irreconcilable with each other.  MedImpact either lied in November 2016 when it told Blink Health that it had reviewed those contracts or that those contracts did not provide the right to exit to other pharmacies, or MedImpact is now lying in an attempt to explain away its unwillingness to comply with its contractual obligations.  Either way, it is clear that MedImpact is unwilling, or unable, to maintain Blink Health's pharmacy network as required by Section 2A of the Service Agreement despite its representations to the contrary.  These misrepresentations have harmed Blink Health and its patients.

### (c)     MedImpact Again Breaches the Service Agreement by Unilaterally Increasing Prices for Prescriptions Redeemed by Blink Health Patients at Walmart Pharmacies

94.     Walmart is another large pharmacy chain in MedImpact's network. On April 28, 2017, MedImpact—again without any notice or explanation—notified Blink Health that, effective May 1, 2017, MedImpact would unilaterally increase the price of Blink Health prescriptions redeemed at Walmart pharmacies by 129%.

95.     To implement this price increase, Ashok Yerasi, MedImpact's Vice President of Network Relations, adjusted Blink Health's MAC formula by changing the prices for prescription medications purchased by Blink Health patients and filled at Walmart.  MedImpact's actions would have sparked substantial price increases for Blink Health patients, and only for Blink Health patients, had Blink Health not negotiated a bilateral commercial agreement with Walmart in an effort to cure this breach.  No other MedImpact clients were subjected to the same price increase.

96.     This conduct by MedImpact constituted another material breach of the Service Agreement.  Specifically, and as described above, the Service Agreement requires that any changes to Blink Health's pricing be "similar to changes made to MAC lists of funded Clients with similar number[s] of Eligible Members."  Despite that unequivocal equal treatment requirement, MedImpact did not change, and has not since changed, any other MedImpact client's MAC.

97.     Given the devastating effect MedImpact's 129% price increase would have on Blink Health's business, Blink Health again sought to engage directly with MedImpact in an effort to resolve the issue.

98.     MedImpact informed Blink Health of the attempted rate increase through its account manager, Mr. Paul.  As has repeatedly been the case, however, there is reason to doubt that the information conveyed by Mr. Paul was accurate.  Although Mr. Paul told Blink Health that Mr. Halter was "red in the face" while negotiating with Walmart regarding the allegedly Walmart-initiated price increases, in subsequent discussions, Mr. Halter stated that he "had never spoken with Walmart."  Blink Health learned from Mr. Halter that MedImpact had in fact delegated negotiations to a junior

employee, further evidence that Mr. Paul will tell whatever tale he thinks Blink Health wants to hear, notwithstanding his and MedImpact's obligation to tell Blink Health the truth.

99.     Mr. Paul also told Blink Health that it should communicate directly with Walmart to obtain information about the price increase, and Mr. Paul and Mr. Halter explicitly encouraged Blink Health to "use [Blink Health's] contacts at Walmart to preserve [Blink Health's] rates."

100.     Although MedImpact—not Blink Health—had the direct counterparty relationship with Walmart and was contractually required to ensure equal price treatment between Blink Health and similarly situated MedImpact clients, Blink Health had no choice but to do as it was told by MedImpact. Accordingly, Blink Health entered into discussions with Walmart regarding a direct contractual relationship.

101.     These negotiations resulted in Blink Health and Walmart entering into a bilateral "Pharmacy Participation Agreement," or "PPA," on April 29, 2017. The PPA allows Blink Health patients to obtain directly from Walmart fair prescription prices that Blink Health has negotiated on their behalf. These prices were substantially better than those that MedImpact had recently attempted to force Blink Health to accept. Under that agreement, Blink Health continues to process payments for prescriptions through MedImpact, but Blink Health patients who fill their prescriptions at Walmart pharmacies pay the prices Blink Health negotiated with Walmart—rather than the onerous 129% price increase MedImpact attempted to force on Blink Health.

102.     While they were negotiating with Walmart, Blink Health executives had a telephone discussion with Mr. Yerasi on May 1, 2017. During that call,

Mr. Yerasi confirmed that MedImpact's pricing changes exclusively targeted Blink Health, and that MedImpact was moving Blink Health from the MAC3 price schedule to a new, Blink Health-specific price schedule.  Mr. Yerasi thus effectively admitted that MedImpact had breached Section 1.16 of the Service Agreement.

103.    Blink Health's direct negotiations with Walmart apparently caused MedImpact significant consternation—even though they were encouraged by MedImpact in the first instance.  Despite its earlier statements encouraging Blink Health to negotiate directly with Walmart—a step necessitated by MedImpact's own breach of the Service Agreement—MedImpact did an abrupt about-face once the PPA had been consummated.  Specifically, on June 2, 2017, MedImpact's outside counsel sent Blink Health a letter claiming the PPA violated the Service Agreement.  In the letter, which was riddled with factual misstatements, MedImpact asserted that the Service Agreement somehow barred Blink Health from negotiating directly with other pharmacies—despite MedImpact's explicit instructions to Blink Health to the contrary.

> **(d)    MedImpact Conceals Information About Publix from Blink Health and Subsequently Excludes Publix from Blink Health's Network**

104.    Publix is a grocery store chain that manages approximately 900 pharmacies in six states in the Southeastern United States.  Publix is also in MedImpact's pharmacy network.  Publix was one of Blink Health's largest pharmacy partners and worked with Blink Health for almost two years.  As of January 2017, more than 2% of prescriptions filled by Blink Health patients were filled at Publix.

105.    On May 5, 2017, Blink Health learned from its customer services representatives that patients were suddenly having difficulty redeeming their prescriptions ordered through Blink Health at Publix pharmacies.

106.     In an effort to identify the source of the problem, a member of Blink Health's customer support team called a Publix pharmacy and was told that all Publix pharmacies had received a notice stating that Publix would no longer be filling prescriptions ordered through Blink Health.  Blink Health was shocked to learn that Publix had stopped processing Blink Health patient claims.  In other words, Publix had been allowed to unilaterally exit Blink Health's network, just as Walgreens had done months earlier.  And, even more shocking was the fact that Publix took this action despite the fact that, as noted, MedImpact had explicitly and repeatedly represented to Blink Health that Walgreens was the *only* pharmacy in MedImpact's network with the contractual right to stop filling prescriptions for Blink Health patients.

107.     Confronted with this development and additional evidence of MedImpact's fraudulent conduct, Blink Health immediately contacted MedImpact to make inquiries about the status of the Publix relationship.  Despite multiple attempts by Blink Health to make contact with MedImpact, however, MedImpact failed to respond to Blink Health for at least six days.

108.     Finally, on May 11, 2017, Mr. Paul responded by sending Blink Health an email in which he wrote that he was "tracking down what the deal is."  Mr. Paul first cited an alleged technical glitch, but this excuse would not explain why, to this day, Blink Health patients cannot purchase prescriptions at Publix.  Months later, MedImpact still has failed to provide Blink Health with any explanation for why Publix took the actions it did, to reconcile its representations concerning the termination rights of the pharmacies in its network, or to provide Blink Health with a termination notice from Publix—assuming one even exists.

109.    After Blink Health received Mr. Paul's May 11 email, on May 12, 2017, Blink Health contacted Publix to ask why Blink Health patients could no longer redeem prescriptions at Publix.  A Publix executive stated that Publix had notified MedImpact that Publix was withdrawing from Blink Health's network on May 5, 2017, more than a week earlier.  When asked whether Publix had changed it relationship with any other MedImpact customer, the Publix executive confirmed that the change affected no MedImpact customers other than Blink Health.

110.    The information Publix provided to Blink Health directly contradicts Mr. Paul's assertions that MedImpact was unaware of the fact that Publix had exited the Blink Health network.  Information currently available to Blink Health strongly supports the Publix executive's statement that Publix had notified MedImpact of its withdrawal decision at least one week beforehand, and directly undermines Mr. Paul's contrary assertions.  For example, and among other things, on May 11, 2017, Blink Health's engineers discovered that MedImpact had updated its claims processing software to stop accepting Blink Health prescriptions at Publix.

111.    As of May 5, 2017, Blink Health patients cannot fill their prescriptions at Publix pharmacies.

**F.    MedImpact Falsely States That CVS's Agreement Provided for Permanent Pricing Not Subject to Change Before Breaching the Service Agreement by Unilaterally Increasing Prices for Prescriptions Filled at CVS Pharmacies**

112.    Until recently, CVS was the largest pharmacy chain for Blink Health in MedImpact's network and the anchor of Blink Health's business.

113.    On December 21, 2016, MedImpact executive Scott Paul notified Blink Health that MedImpact had reached a new agreement for rates that would govern

Blink Health's claims process at CVS pharmacies.  Mr. Paul told Blink Health that these rates were permanent and not subject to change.  Mr. Paul also told Blink Health that it could secure even lower rates from CVS if Blink Health agreed to remove other pharmacies from its network—thus trying to *increase* Blink Health's dependence on this single pharmacy chain.

114.    Based on MedImpact's assurances that Blink Health patients would have uninterrupted access to CVS's pharmacies, as well as CVS's professed desire to expand its relationship with Blink Health in the future, Blink Health spent millions of dollars transitioning tens of thousands of patients to CVS.[2]

115.    In July 2017, Blink Health and its network management team again approached Tom Gibbons, CVS's Senior Vice President of Payer Relations, to establish a direct relationship between the two companies.  Mr. Gibbons agreed to negotiate a direct agreement with Blink Health at the same rates Blink Health paid to access CVS's network through MedImpact, and committed to work in good faith to execute such an agreement by August 15, 2017.  Blink Health expected this negotiation to swiftly conclude, as just eight months earlier, it had provided CVS with its prescription claim mix and the rates which its patients could afford to pay.

116.    Nevertheless, despite the negotiations with Mr. Gibbons and despite Mr. Paul's express representations that (i) no pharmacy had the right to unilaterally exit Blink Health's network, and (ii) Blink Health had permanent access to CVS, on August 21, 2017, CVS Pharmacy President Helena Foulkes told Blink Health

---

[2]    As part of this effort, Blink Health expended substantial resources transferring patients who had previously filled prescriptions at Walgreens over to CVS.  *See* ¶ 165, *supra*.

that CVS was planning to exit Blink Health's network, preventing Blink Health's patients from purchasing their prescriptions at any CVS pharmacy.

117. On September 6, 2017, Mr. Paul sent Blink Health an email in which he reported that "MedImpact [had] received a formal 30-day termination [from CVS] for participation in the Blink program." Despite repeated written requests by Blink Health, including through counsel, MedImpact has refused to provide Blink Health with a copy of the purported termination notice from CVS. To the contrary, MedImpact took the position that it was not "obligate[d] to provide Blink Health with the CVS termination notice or information regarding MedImpact's agreement with CVS." Since then MedImpact has stayed the course, refusing to provide Blink Health with a copy of the termination notice even to this day.

118. Instead, MedImpact suggested it *might* comply with its contractual obligation to maintain a sufficient network of participating pharmacies *only* if Blink Health acquiesced in MedImpact's demand that Blink Health succumb to a nearly ***250% price increase***. That demand by MedImpact was a flagrant breach of its contractual obligations and unreasonable on its face. Indeed, if Blink Health subjected itself to the conditions MedImpact sought to impose, Blink Health would lose money on almost every prescription its patients filled at CVS. Moreover, despite the Service Agreement's clear requirement that MedImpact treat Blink Health the same as other funded MedImpact clients with similar numbers of eligible members, MedImpact was not applying this price increase to any other clients. Instead, MedImpact was unilaterally raising Blink Health's prices for patients filling prescriptions at CVS's pharmacies, which is exactly what Section 1.16 of the Service Agreement prohibits.

119.    This proposed price increase also exposed the falsity of Mr. Paul's representation that the CVS prices were permanent and not subject to change.  It was based on this representation that Blink Health spent millions of dollars to transition patients from Walgreens to CVS.  Had Mr. Paul not misrepresented the nature of CVS's prices, Blink Health would have redirected its patients to other pharmacies (as it has worked to do since CVS exited the network), lessening the catastrophic impact of CVS's later withdrawal from the Blink Health network.

120.    On October 6, 2017, Blink Health participated in a conference call with Mr. Halter and Mr. Paul to discuss MedImpact's 250% price increase demand. During the call, Mr. Paul warned that if Blink Health did not accept the price increase, Blink Health's patients would lose access to CVS's pharmacies by October 16, 2017—a mere ten calendar days later.  This price increase would have dramatically increased MedImpact's profits—at the expense of Blink Health's patients—by increasing its per claim dispense fee from $1.75 to $2.75 and ensuring that Blink Health would lose money on virtually every Blink Health prescription dispense at CVS.

121.    Mr. Paul and Mr. Halter also claimed that MedImpact uses a standardized contract with the participating pharmacies in its network and that "any pharmacy in the network can upon 30 days' notice pull out any individual client"— including Blink Health.  When the Blink Health representatives observed during the call that this provision directly contradicted the express representations and assurances MedImpact executives had repeatedly made to Blink Health (¶¶ 86–93, *supra*), Mr. Paul conceded that he "understood" and "remembered those discussions."  He acknowledged that Blink Health had raised over $90 million in funding and spent over $50 million in

reliance on his past representations about withdrawal rights and that the impact of that reliance had been "catastrophic," but said only that he "d[idn']t know what to tell you." Mr. Paul also sought to justify his past misrepresentations by claiming that he did not "know off the top of [his] head" who had provided information about the contract review to him and would have to "find out where that information came from . . . um . . . internally."

122. On October 9, 2017, Mr. Paul sent an email with additional details on MedImpact's purported unilateral price increase. Blink Health replied on October 11, 2017, explaining that Blink Health could not accept a 242% rate increase at CVS pharmacies. In response, Mr. Paul claimed that CVS, not MedImpact, had made the decision to adjust Blink Health's pricing, and further asserted that "MedImpact can confirm that CVS had the right to terminate its participation in Blink Health's program." Mr. Paul went on to assert that MedImpact "dispute[d]" what he characterized as Blink Health's "self-serving assertion that MedImpact made any representations to the contrary." (Mr. Paul's suggestion that Blink Health's accurate account of MedImpact's prior representations was somehow "self-serving" is itself revealing; he appears to understand the gravity of his earlier misrepresentations.) And, Mr. Paul asserted, notwithstanding the pricing provisions in the Service Agreement and without citing any contractual provision to the contrary, that "[n]othing in the contracts between MedImpact and Blink Health prohibits CVS's proposed MAC pricing adjustments." That assertion was baseless.

123. After further email communications between the parties, on October 12, 2017, Blink Health decided that it had no choice but to accept the

unreasonable, unilaterally-imposed price increase as a short-term concession to preserve its patients' pharmacy access while a more sustainable rate schedule could be negotiated. Although MedImpact had previously and repeatedly told Blink Health that CVS's only concern was pricing, and Ms. Foulkes at CVS had likewise conveyed that CVS's concerns with Blink Health were "exclusively a rates issue," Mr. Paul responded the next day, October 13, 2017, that MedImpact would "inform CVS that Blink Health has elected to accept the proposed adjustments to MAC pricing" and assured Blink Health that, "[a]ssuming that CVS is still willing to participate in Blink Health's program with the proposed adjustments, MedImpact [would] implement them immediately."

124.    MedImpact has given Blink Health no indication as to whether it actually informed CVS that Blink Health would accept the price increase MedImpact had demanded.  In fact, when Blink Health consulted with CVS the next day, CVS advised Blink Health that it had heard nothing from MedImpact on that issue.  Instead, on October 17, 2017, Mr. Paul sent another email to Blink Health claiming that "CVS [had] declined to withdraw its termination of its participation in the Blink Health program."  In a subsequent email, Mr. Paul claimed that CVS had extended the effective date of the termination to October 27, 2017.

125.    That proved to be one of the very few accurate statements made by Mr. Paul.  On October 27, 2017, CVS exited the Blink Health network, preventing Blink Health's patients from accessing their CVS prescriptions.  As a result, MedImpact's network of pharmacies decreased by more than 20%, another "material breach" of the Service Agreement.

**G.    MedImpact's Repeated and Willful Breaches of the Service Agreement Have Resulted, and Continue to Result, in Substantial Harm to Blink Health and Its Patients**

126.    The Service Agreement is critical to Blink Health's business. MedImpact, however, has repeatedly and willfully breached the Service Agreement.

127.    Although MedImpact is contractually obligated to manage and maintain a network of pharmacies for Blink Health, it has failed to do so.  Each time MedImpact allows a pharmacy chain to unilaterally exit Blink Health's network, in breach of the Service Agreement, patients who have already purchased medications through Blink Health's website or mobile application cannot obtain those prescriptions at the affected pharmacy chain.  Because credit and debit card providers can take up to ten days to refund these payments, these patients may lack the funds to purchase medications from alternative sources during this period.  This is a very real harm to Blink Health's uninsured patients, who are often cobbling together funds to pay for needed medications.  Moreover, the resources Blink Health expends developing and marketing its business are wasted when patients discover they cannot redeem prescriptions at previously-available pharmacies.  Many of these patients do not return to Blink Health, presumably viewing its ability to deliver as unreliable.

128.    Most recently, MedImpact's breach regarding CVS has had disastrous consequences for Blink Health.  Immediately before CVS's exit from Blink Health's network, approximately 56% of prescriptions filled by Blink Health's patients were filled at CVS, a percentage that increased as Blink Health shifted patients to CVS based on representations by CVS and MedImpact.  (Prior to those representations, approximately 33% of Blink Health prescriptions were filled at CVS.)

129.     MedImpact is also required to provide Blink Health with the
pricing negotiated in Section 1.16 of the Service Agreement.  It has not done so.  Instead,
MedImpact has repeatedly attempted to increase Blink Health's prices at different
pharmacies, including Walmart and CVS.  MedImpact has offered a series of shifting
rationales in an effort to justify its repeated breaches of Section 1.16 of the Service
Agreement.  None of these supposed rationales in any way justifies MedImpact's
breaches.

**H.     MedImpact Tortiously Interferes with Blink Health's Efforts to
Consummate Direct Commercial Relationships with Pharmacies**

130.     While Blink Health needed a third-party PBM provider to launch
its business, as that business has grown, Blink Health has also worked to build its own
network of pharmacies.  Blink Health does so by negotiating what are called direct
relationships with pharmacy chains.  In a direct relationship, Blink Health negotiates an
agreement that allows its patients to fill their prescriptions at a pharmacy chain without
relying on MedImpact for access or discounted pricing.  Blink Health initially began
negotiating these relationships at MedImpact's explicit direction, and has increased its
efforts to do so in order to mitigate the effects of MedImpact's continued failures to
maintain its network.

131.     Once Blink Health successfully did so, however, MedImpact
abruptly reversed course.  Although it had encouraged Blink Health to negotiate directly
with pharmacies, MedImpact subsequently decided that such direct relationships would
threaten MedImpact's business model of driving up drug prices and profiting from rising
healthcare costs.  MedImpact thus needed to prevent Blink Health from forming direct
relationships with pharmacies, and set out to do so.

132.    Beginning in October 2016, Blink Health and CVS had a series of discussions regarding such a potential business relationship and to establish long-term rates that would govern prescription reimbursement rates for prescriptions filled at CVS. At the time, during a meeting at CVS headquarters in Rhode Island, Helena Foulkes, the Executive Vice President for CVS Health and the President of CVS Pharmacy, instructed Tom Gibbons, CVS's Senior Vice President of Payer Relations, to negotiate a narrow network rate agreement for Blink Health's patients to ensure Blink Health's patients had access to CVS pharmacies.  As Kevin Hourican, CVS's Executive Vice President, Pharmacy Services and Supply Chain, stated in an email to Blink Health executives on November 10, 2016, "[i]t is very clear to me, and to our patients, that [Blink Health is] solving an un-met consumer need with your service . . . .  We are very interested at CVS in helping patients solve the cost/access problem that they are facing today."

133.    In connection with these discussions, Blink Health provided CVS with detailed information about Blink Health's mix of drugs.  By November 2016, these meetings had progressed to contract negotiations between Blink Health executives and Mr. Gibbons.  Although the parties were close to a deal, on December 20, 2016, Mr. Gibbons informed William Doyle, Blink Health's Executive Chairman, that "we have been instructed by MedImpact that all negotiations regarding Blink Health will be handled by MedImpact and that Blink is not authorized to negotiate directly."  Mr. Gibbons also noted that they were "working diligently to finalize a rate agreement with MedImpact that week" and he "look[ed] forward to further strategic discussions between our two companies," but at that time, he had to "follow the direction of your PBM."

134.    On August 16, 2017, when the parties again considered the possibility of a direct agreement, CVS requested that Blink Health provide a letter representing and warranting that the Service Agreement did not "preclude Blink Health from entering into bilateral network agreements with pharmacies," including CVS. Despite this confirmation, and because of MedImpact's continued interference, Mr. Gibbons informed Blink Health that CVS would not deal directly with Blink Health.

135.    MedImpact's statements to CVS were false.  Although the Service Agreement grants MedImpact limited exclusivity rights for Blink Health's first 100,000 patients, Blink Health had surpassed any conceivable exclusivity threshold by December 2016.  Indeed, when the issue of CVS's rates arose in August 2016, MedImpact executive Aaron Roberts specifically instructed Geoffrey Chaiken to negotiate directly with CVS to preserve Blink Health's pricing at CVS pharmacies.  MedImpact's misrepresentations to CVS were made to retain MedImpact's lucrative position as a middleman between Blink Health and pharmacies.  MedImpact's successful effort to derail a direct Blink Health-CVS relationship was part and parcel of MedImpact's scheme to dominate a highly consolidated industry and to prevent competition from startups like Blink Health.

136.    In reality, MedImpact has repeatedly acknowledged privately, to Blink Health, that the parties are not bound by any operative exclusivity agreement. Moreover, on multiple occasions, MedImpact's representatives have expressed their desire to renegotiate an agreement that does—unlike the Service Agreement—provide for exclusivity.  For example, in a February 27, 2017 email, Mr. Paul stated that the Service Agreement "was crafted in a way that *there is no real exclusivity*.  [MedImpact] would like to pursue an exclusive relationship [with Blink Health].  If we cannot come to an

agreement, then we would like to agree to a minimum number of claims/mo [month]
instead of exclusivity based on lives" (emphasis added).

137.     Nonetheless, MedImpact has repeatedly—and falsely—told other
pharmacies that they are precluded from negotiating directly with Blink Health or that, if
they want to have direct negotiations with Blink Health, they must secure MedImpact's
permission to do so.  For example, in April 2017, Mr. Paul and Mr. Halter encouraged
Blink Health to negotiate directly with Walmart.  Blink Health later learned, however,
that MedImpact's encouragement was mere lip service and that MedImpact was in fact
attempting to directly undermine the Blink Health-Walmart relationship.

138.     These statements by MedImpact to potential Blink Health
counterparties have absolutely no basis in fact.  They are intended only as a bad faith
maneuver on MedImpact's part to thwart Blink Health from obtaining direct pharmacy
access.  MedImpact's misconduct has had its desired effect.  As a direct result of
MedImpact's false statements and improper interference, several pharmacy chains have
told Blink Health that even though they are interested in pursuing direct negotiations with
Blink Health, they believe they are unable to do so because of MedImpact.

139.     The motivations for such misstatements are clear: Mr. Paul himself
explained to Blink Health, when another client, Watertree Health, successfully negotiated
a direct relationship with a pharmacy chain, it was the source of substantial
embarrassment, and indeed career jeopardy, to Mr. Paul, Mr. Halter and other senior
MedImpact executives.  Indeed, such direct deals call into question whether MedImpact's
existence, as a middleman aggregating claims, adds any value at all.

**COUNT I**
**Breach of Contract**
**(Against MedImpact)**

140.     Blink Health repeats and realleges, as if fully set forth herein, the allegations of paragraphs 1 through 139 above.

141.     The Service Agreement is a binding and enforceable contract between Blink Health and MedImpact.

142.     Blink Health has fully complied with all of its obligations under the Service Agreement.

143.     MedImpact has breached the Service Agreement by, among other things, failing to maintain its pharmacy network as required by Section 2A of the Service Agreement by allowing Walgreens and CVS to exit that network; failing to honor the pricing schedule provided by Section 1.16 of the Service Agreement by unilaterally increasing Blink Health's prices for claims filled at Walmart and CVS; and failing to treat Blink Health in the same manner as similarly situated MedImpact clients as required by Section 1.16 of the Service Agreement by unilaterally increasing Blink Health's prices for claims filled at Walmart and CVS.

144.     As a result of MedImpact's repeated breaches of the Service Agreement, Blink Health has suffered substantial damages.

**COUNT II**
**Breach of the Implied Covenant of Good  Faith and Fair Dealing**
**(Against MedImpact)**

145.     Blink Health repeats and realleges, as if fully set forth herein, the allegations of paragraphs 1 through 144 above.

146.     The Service Agreement is a binding and enforceable contract inherent in which is an implied covenant of good faith and fair dealing.

147.   Blink Health entered into the Service Agreement with MedImpact with the legitimate expectation that MedImpact would maintain a pharmacy network on behalf of Blink Health.

148.   MedImpact, for its part, lacked the ability to maintain the pharmacy network it was contractually required to maintain and thus did not and could not fulfill Blink Health's legitimate expectations under the Service Agreement.   What is more, MedImpact knew, or should have known, that it lacked the ability to maintain a stable network even at the time it entered into a contract requiring it to do so, and thus could not provide Blink Health with the benefits of the bargain the parties struck.   There is no clearer breach of the implied covenant of good faith.

149.   In addition, and in direct violation of the implied covenant of good faith and fair dealing, MedImpact, including through statements and actions by Mr. Paul and Mr. Halter, actively sought to deny Blink Health the benefits of the parties' bargain as memorialized in the Service Agreement by deliberately withholding information from Blink Health about its interactions with pharmacies in MedImpact's network, including Walgreens, Walmart, Publix, and CVS, and colluding with various pharmacies to deny Blink Health and its patients access to those pharmacies.   MedImpact also falsely told Blink Health that it was taking reasonable steps to secure such access for Blink Health and its patients even as it affirmatively did the opposite.   MedImpact has thereby actively worked to prevent Blink Health from receiving the fruits of its bargain.

150.   As a result of MedImpact's repeated breaches of the implied covenant of good faith and fair dealing inherent in the Service Agreement, Blink Health has suffered substantial damages.

## COUNT III
## Fraudulent Inducement
## (Against All Defendants)

151.    Blink Health repeats and realleges, as if fully set forth herein, the allegations of paragraphs 1 through 150 above.

152.    During the parties' negotiations concerning the Service Agreement, MedImpact, MINCA, and Mr. Paul explicitly and intentionally represented to Blink Health that they had the ability to maintain a network of pharmacies on behalf of Blink Health and that they had authority to set prices for all of its customers to ensure that Blink Health would pay the same rates as other similarly situated clients.  Those representations were intentionally false, and they were material.  In reality, MedImpact and MINCA lacked both the contractual ability to maintain a pharmacy network and the ability to provide negotiated pricing across that network.

153.    MedImpact, MINCA, BH Holdings Group I, LLC, and Mr. Paul willfully misrepresented their abilities and authority in order to induce Blink Health to enter into the Service Agreement and later to amend the Service Agreement and enter into the Stock Purchase Agreement.

154.    Blink Health actually and justifiably relied to its detriment on MedImpact, MINCA, Inc., BH Holdings Group I, LLC, and Mr. Paul's false representations regarding MedImpact's and MINCA's pharmacy network and pricing control in deciding to enter into the Service Agreement and the amendment to the Service Agreement.

155.    Blink Health would not have entered into the Service Agreement, the amendment to the Service Agreement, or the Stock Purchase Agreement but for MedImpact, MINCA, BH Holdings Group I, LLC, and Mr. Paul's willfully false and

material representations. Accordingly, Blink Health is entitled to rescission of the Service Agreement and the return of all fees paid to MedImpact under the Service Agreement, to rescission of the amendment to the Service Agreement, and to rescission of MINCA's investment in Blink Health through BH Holdings Group I, LLC, under the Stock Purchase Agreement.

156. As a result of MedImpact, MINCA, BH Holdings Group I, LLC, and Mr. Paul's false representations and fraudulent inducement, Blink Health has also suffered substantial damages. Further, given the wanton and willful nature of MedImpact, MINCA, BH Holdings Group I, LLC, and Mr. Paul's misconduct, MedImpact, MINCA, BH Holdings Group I, LLC, and Mr. Paul are liable to Blink Health for punitive damages.

**COUNT IV**
**Common Law Fraud: Misrepresentations Regarding Withdrawal Rights**
**(Against MedImpact, MINCA, and Mr. Paul)**

157. Blink Health repeats and realleges, as if fully set forth herein, the allegations of paragraphs 1 through 156 above.

158. Following Walgreens' unilateral withdrawal from Blink Health's network in March 2017, Blink Health asked MedImpact, including Mr. Paul and Mr. Halter, to review its pharmacy network contracts and confirm for Blink Health that no other pharmacy in MedImpact's network had similar withdrawal rights.

159. In response to Blink Health's request, MedImpact, through Mr. Paul and Mr. Halter, explicitly represented to Blink Health that it had reviewed all of its pharmacy network contacts and that Walgreens had a special contract that permitted Walgreens to unilaterally withdraw, but that no other pharmacy chain in MedImpact's

pharmacy network could unilaterally withdraw from Blink Health's network as Walgreens had done.

160.    These representations were knowingly false, and they were material.  In reality, MedImpact either did not review its contracts or deliberately misrepresented their contents to Blink.  MedImpact's fraud was only revealed to Blink Health when, beginning in April 2017, MedImpact began representing to Blink Health that all of MedImpact's contracts with pharmacies in its network included unilateral withdrawal rights.

161.    Blink Health actually and justifiably relied to its detriment on MedImpact's fraudulent representations by maintaining its contractual relationship with MedImpact instead of pursuing a cause of action for breach or entering into a new contract with another pharmacy benefit manager.

162.    As a direct result of these false and material representations and other fraudulent conduct by MedImpact and Mr. Paul, Blink Health has suffered substantial damages.  In addition, given the wanton and willful nature of MedImpact's, MINCA's, and Mr. Paul's misconduct, MedImpact, MINCA, and Mr. Paul are liable to Blink Health for punitive damages.

**COUNT V**
**Common Law Fraud:  Misrepresentations Regarding CVS Rates**
**(Against MedImpact, MINCA, and Mr. Paul)**

163.    Blink Health repeats and realleges, as if fully set forth herein, the allegations of paragraphs 1 through 162 above.

164.    In December 2016, Mr. Paul told Blink Health that MedImpact had secured Blink Health permanent pricing not subject to change, and that Blink Health could get lower prices by removing other pharmacies from its network.

165.     In reliance on Mr. Paul's representation, Blink Health undertook to transfer as many patients as possible to CVS in order to take advantage of this permanent pricing.  Indeed, Blink Health spent millions of dollars transferring patients to CVS pharmacies.

166.     These representations were knowingly false, and they were material.  In reality, MedImpact had not secured Blink Health even the minimum of protection from CVS's right to withdraw from Blink Health's network.

167.     Before CVS withdrew, MedImpact first attempted to extract a nearly 250% price increase from Blink Health, demonstrating the falsity of its earlier statement that it had secured permanent pricing not subject to change for Blink Health.

168.     Blink Health actually and justifiably relied to its detriment on MedImpact and Mr. Paul's fraudulent representations by spending millions of dollars to assist its patients to use CVS pharmacies, thinking this would secure it long-term protection, but in reality only exposing it to greater losses upon CVS's eventual withdrawal from its network.

169.     Additionally, Blink Health has been harmed because it now must expend additional money to encourage its CVS patients to continue to use Blink Health at a remaining participating pharmacy.

170.     As a result of MedImpact's and Mr. Paul's false and material representations and other fraudulent conduct, Blink Health has suffered substantial damages.  In addition, given the wanton and willful nature of MedImpact's and Mr. Paul's misconduct, MedImpact and Mr. Paul are liable to Blink Health for punitive damages.

## COUNT VI
## Tortious Interference with Prospective Economic Relations
## (Against MedImpact, MINCA, and Mr. Paul)

171.    Blink Health repeats and realleges, as if fully set forth herein, the

allegations of paragraphs 1 through 170 above.

172.    Blink Health had a prospective business relationship with CVS that

it was pursuing with the expectation of developing a direct bilateral contract with CVS.

173.    MedImpact, MINCA, and Mr. Paul knew about Blink Health's

negotiations with CVS and intentionally interfered with those negotiations by falsely

telling CVS that Blink Health was precluded from negotiating directly with CVS by

virtue of Blink Health's contract with MedImpact.  MedImpact, MINCA, and Mr. Paul

knew that information to be false at the time.

174.    MedImpact, MINCA, and Mr. Paul were not motivated by

legitimate economic interests in obstructing the negotiations between Blink Health and

CVS and instead used dishonest, unfair, and/or improper means by deliberately making

false statements to CVS about the nature of the relationship between Blink Health and

MedImpact.  In doing so, MedImpact, MINCA, and Mr. Paul improperly, and without

any justification, sought to disparage Blink Health in their communications with

pharmacy chains like CVS for their own benefit.

175.    As a result of MedImpact, MINCA, and Mr. Paul's tortious

interference with Blink Health's prospective business relationship with CVS, Blink

Health has suffered substantial damages.  In addition, given the wanton and willful nature

of MedImpact's, MINCA's, and Mr. Paul's misconduct, MedImpact, MINCA, and Mr.

Paul are liable to Blink Health for punitive damages.

## **PRAYER FOR RELIEF**

Wherefore, Blink Health demands judgment against MedImpact and the individual defendants as follows:

(a)    Money damages in an amount to be determined at trial;

(b)    Punitive damages in an amount to be determined at trial;

(c)    Rescission of the Service Agreement and an order directing MedImpact to return all fees received under the Service Agreement to Blink Health;

(d)    Rescission of the amendment to the Service Agreement and of MINCA's investment in Blink Health;

(e)    Attorneys' fees, costs, and disbursements incurred as a result of this action; and

(f)    Such other, further and different relief as the Court may deem just and proper.

**JURY DEMAND**

Blink Health demands a trial by jury on all issues triable by a jury.


Dated: New York, New York
November 14, 2017

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____

Andrew J. Ehrlich (aehrlich@paulweiss.com)
Gregory F. Laufer (glaufer@paulweiss.com)
James H. Borod (jborod@paulweiss.com)

1285 Avenue of the Americas
New York, New York  10019-6064
Tel: (212) 373-3000
Fax: (212) 757-3990

*Attorneys for Blink Health Ltd. and Apollo Access Ltd.*